UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
================================================================

LAURA (GODOY) NICOLE,[1]
         Plaintiff,

v.                            1:05-CV-01083 (NPM)

MICHAEL J. ASTRUE,[2]
Commissioner of Social
Security Administration,
         Defendant.
-------------------------------------------------------------------------------------------------

APPEARANCES                   OF COUNSEL

Office of Peter M. Margolius       Peter M. Margolius, Esq.
Attorney for the Plaintiff
7 Howard Street
Catskill, N.Y.     12414

Office of the United States Attorney    William H. Pease, Esq.
Attorney for the Defendant
100 S. Clinton Street
Syracuse, N.Y.    13261

NEAL P. McCURN, Senior U.S. District Court Judge

## MEMORANDUM - DECISION AND ORDER

Plaintiff Laura (Godoy) Nicole ("plaintiff") brings this action pursuant to

§205(g) of the Social Security Act (the "Act"), codified at 42 U.S.C. § 405(g).

---

[1]    Plaintiff's married name is Godoy. Plaintiff's Social Security information remains in the name Nicole, plaintiff's maiden name. Tr. at 52.

[2]    On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security and is substituted for Commissioner Jo Anne B. Barnhart as defendant in this action. Fed.R.Civ.P. 25(d)(1).

Plaintiff seeks review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying plaintiff's claim for disability insurance benefits ("DIB") under the Act.  Specifically, plaintiff alleges that the decision of Administrative Law Judge ("ALJ") Joseph F. Gibbons, denying plaintiff's application for DIB, was against the weight of substantial evidence contained in the record and contrary to applicable legal standards.  The Commissioner moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), arguing that the ALJ's decision was supported by substantial evidence.

The ALJ found that although plaintiff has been under a total disability since January 20, 2000, submitted evidence shows that her impairments prior to December 31, 1998, the date she was last insured, failed to produce more than a minimal effect on her ability to perform basic work activities.  Therefore, the ALJ concludes, the plaintiff is not entitled to Title II (disability insurance) benefits. Tr. at 24.  The issue before this court is whether the case should be remanded for clarification of the plaintiff's condition prior to her date last insured.  For the reasons set forth below, the court finds that the there is substantial evidence in the record to undermine the ALJ's decision, and remands the case for clarification of the plaintiff's condition prior to her date last insured.

I.     PROCEDURAL HISTORY and FACTS

The following recitation of the procedural history and facts of this case are taken from the party submissions and the administrative record.  Where the parties' rendering of the facts differs from the record, where facts are omitted, or in the interest of clarification, the facts will be supplemented as needed by undisputed facts from the record.  Because the ALJ determined that plaintiff has been disabled since a motor vehicle accident on January 20, 2000, the court does not concern itself with events subsequent to that date, nor does the court consider the ALJ's award of Supplemental Security Income benefits ("SSI") to the plaintiff. The court does, however, include events in the time period between plaintiff's date last insured and the date of her motor vehicle accident in order to clarify this court's decision.

### A.    Procedural History

Plaintiff filed an application dated September 9, 2003[3] for Social Security Disability Benefits ("DIB"), alleging disability due to a cardiac condition, back impairment and neck impairment.  Tr. at 20; 80.  Plaintiff's application was denied on December 26, 2003.  Tr. at 62-65.  On January 12, 2004, plaintiff made a

---

[3]    The ALJ and the Commissioner refer to August 11, 2003 as the date of plaintiff's application for both DIB and SSI.  The Commissioner notes that the application for SSI benefits is not in the record. Doc. No. 13, n. 1.  The DIB application is clearly dated September 9, 2003 (Tr. at 82; 106), and the record indicates plaintiff filed her SSI application on August 11, 2003. Tr. at 107.  The court therefore finds that plaintiff's SSI claim was filed on August 11, 2003, and the filing date for plaintiff's DIB claim was September 9, 2003.

timely request for a hearing before an ALJ.  Tr. at 66.  The hearing was held on

June 28, 2004 in Albany, New York. Tr. at 27-57.  On August 18, 2004, the ALJ

issued a partially favorable decision, awarding plaintiff SSI payments, but finding

that although plaintiff had been under a disability pursuant to the Act since

January 20, 2000, she was insured for benefits only through December 31, 1988.

Tr. at 24.

On September 30, 2004, plaintiff appealed the ALJ's decision. Tr. at 15.  On

March 15, 2005, plaintiff supplemented her appeal with April 1988 medical

records from Dr. Denton A. Cooley ("Dr. Cooley") of the Texas Heart Institute.

Tr. at 484-96.  The Appeals Council denied plaintiff's request for review on June

27, 2005 (Tr. at 3-5), making the ALJ's decision the final decision of the

Commissioner.  Plaintiff requested court review of the ALJ's decision by filing

this civil action.

### B.    Facts

At the time of the hearing, plaintiff was fifty-five years old (Tr. at 20), with

a date of birth of August 10, 1948. Tr. at 24.  Plaintiff had a four-year college

degree and past relevant work as a fashion model, news assignment writer,

associate television producer, research assistant and executive assistant for a real

estate developer. Tr. at 20-21.

Plaintiff was diagnosed with rheumatic fever at the age of seven, and again at age ten, which caused her to develop mitral stenosis. Tr. at 441; 490.  At age nineteen, after a dental procedure, plaintiff suffered an episode of subacute bacterial endocarditis, an infection in the heart valves. Tr. at 441;488;490.  While ill with endocarditis, plaintiff began developing arrhythmias, which were treated with medications and, to some degree, controlled. Tr. at 441;490.   Between 1968 and 1988, plaintiff's arrhythmias continued in varying degrees, and she also suffered from rheumatoid arthritis.  Plaintiff was followed by physical examination and non-invasive studies serially throughout this time. Tr. at 441; 490.  In August 1986, while engaged to her future husband, plaintiff entered Mt. Sinai Hospital in New York City for an abdominal abscess, where she remained for 10 days. Tr. at 441.

On April 1, 1987, plaintiff married and moved to South America with her husband, necessitating that she terminate her employment.  She became seriously ill shortly thereafter. Tr. at 98.  From 1986 until April of 1988, plaintiff suffered several serious arrhythmia attacks which included severe vomiting and unconsciousness (syncopal and presyncopal episodes), and approximately ten to twelve emergency room visits to hospitals in Caracus, Venezuela, and the Miami Heart Institute in Florida. Tr. at 442; 490.   Plaintiff was admitted to the Miami

Heart Institute on October 6, 1987. Tr. at 431.  Doctors at the Miami Heart Institute conducted electrophysiologic testing and diagnosed superventricular tachycardias in association with excessory conduction pathway. Tr. at 490. Plaintiff stated that from about eight months prior to April 1988, she had increased dyspnea on exertion, and doctors noted two pillow orthopnea and exercise related chest pains of an increasing frequency. Tr. at 490.

Doctors at the Miami Heart Institute recommended that plaintiff be evaluated by Dr. Cooley in Houston, Texas, a leading specialist in cardiac valve surgery.  Upon inspection of plaintiff's medical records, Dr. Cooley summoned plaintiff to the Texas Heart Institute from her home in Venezuela for evaluation of plaintiff's rheumatic valvular heart disease. Tr. at 442;487.  Plaintiff was admitted to the Texas Heart Institute on April 10, 1988 for evaluation and possible valvular replacement.

On April 11, 1988, right and left cardiac catheterization was performed, as well as Doppler echocardiography, and after review of the results, it was determined that plaintiff would benefit from open mitral commissurotomy.  Tr. at 489; 491.  Dr. Cooley's diagnosis was that plaintiff had complex rheumatic valvular disease including aortic insufficiency, mitral stenosis and mitral regurgitation, and supraventricular tachycardia. Tr. at 488.   Plaintiff underwent

6

open heart surgery on April 12, 1998.  Dr. Cooley performed a successful

commissurotomy, excising tissue from the plaintiff's mitral valve.  Dr. Cooley

utilized temporary cardio-pulmonary bypass for this procedure.  Tr. at 487.  In the

recovery room, an electrocardiogram indicated normal sinus rhythm and no aortic

insufficiency murmur. Tr. at 489.  Post surgery, however, Dr. Cooley opined that

plaintiff did not have a surgically correctable type dysrhythmia, and that plaintiff

should be managed medically. Tr. at 487.  Plaintiff was discharged on April 19,

1988. Tr. at 489.

Plaintiff recuperated at her second home in Miami.  According to plaintiff,

there she developed an inflammation of the cardiac sac.  This condition was

allegedly treated with high doses of antibiotics and codeine, which inhibited

plaintiff's recovery from surgery.  Tr. at 442.  The court was unable to locate these

hospital records and presumes they are not contained in the record.  The court does

find, however, evidence that plaintiff was evaluated on October 27, 1988 at the

Hollywood Diagnostics Center in Hollywood, Florida, and was found to have

aortic regurgitation with mild mitral stenosis (Tr. at 256), indicating that plaintiff's

surgery did not completely correct the heart valve problem.  It was found that there

was dense calcification of the leaflets of the mitral valve, and the left atrium of the

heart was enlarged. Tr. at 256.

7

As a follow-up to the surgery, plaintiff was seen as an outpatient by Leachman Cardiology Associates in Houston, Texas on December 21, 1988.  Dr. Roberto Lufchanowski ("Dr. Lufchanowski") wrote that since the April 1988 surgery, plaintiff had experienced repeated episodes of supraventricular tachycardia, suffering an episode of tachycardia every one to two months lasting from thirty minutes to several hours.  Plaintiff also complained of shortness of breath, positional dizziness and frequent headaches.  Dr. Lufchanowski stated that plaintiff's main problem at that time was the recurrent tachycardias, for which he recommended several possible regimes. Tr. at 432.  He did not believe that the dizziness was cardiac in origin. Tr. at 433.   Plaintiff was again evaluated at the Hollywood Diagnostics center on September 13, 1989, where it was determined that plaintiff had left atrial enlargement, thickening of the mitral valve leaflets with effusion of the posterior leaflet and hockey stick deformity of the anterior leaflet.  Plaintiff's left ventricle appeared normal, but aortic sclerosis was diagnosed, along with mitral regurgitation and moderate mitral stenosis. Tr. at 267.

From 1988 to 1990, plaintiff continued to suffer from arrhythmia and shortness of breath, conditions which were able to be managed with medication. Plaintiff consulted Dr. Israel S. Berowitz ("Dr. Berkowitz"), who stated in a letter

dated April 15, 1995 that plaintiff was under his care for atrial fibrillation, and had been since at least December 29, 1994. Tr. at 435.  On May 23, 1995, Dr. Berkowitz  treated her for mitral stenosis and palpitations with medication in lieu of performing more surgery. Tr. at 435; 443; 391.

In September 29, 1995, plaintiff was evaluated at Lenox Hill Hospital in New York, where a transesophageal echocardiogram was performed, a procedure where the internal functioning of the heart is monitored. Tr. at 443; 437.   As a result of data received from this procedure, plaintiff's doctors recommended cardiac catheterization. Tr. at 443.  Plaintiff was admitted to Columbia Presbyterian Hospital in October of 1995 for evaluation. Tr. at 443.

On June 5, 1996, plaintiff was admitted to The New York Hospital, Cornell University Medical Center, where she had a procedure performed known as a radiofrequency catheter  ablation, in an attempt to reduce the frequency and intensity of the heart arrhythmias  she was experiencing. Tr. at 261; 436. Although the medical record indicated successful ablation of a slow AV nodal pathway (Tr. at 413), plaintiff considered this procedure to be unsuccessful, and by September of 1996, the arrhythmias had once again become severe. Tr. at 443.

In 1996, plaintiff consulted with Dr. Lawrence Katz ("Dr. Katz") for her continued palpitations and arrhythmias.  A letter to plaintiff's attorney dated

October 28, 1996 contains a brief but comprehensive summary of plaintiff's cardiac history by Dr. Katz.  Dr. Katz indicated that plaintiff's "cardiac abnormalities require ongoing surveillance given the likelihood of progression of her valvular disease." Tr. at 438.  Dr. Katz stated that when he last saw plaintiff on October 21, 1996, "[h]er cardiac examination demonstrated a regular rate and rhythm with evidence of harsh cardiac murmurs consistent with mitral valvular disease and her aortic valvular disease." Tr. at 438.  An addendum to that letter dated December 23, 1996 further stated that upon examination of the plaintiff on that date, Dr. Katz noted increased complaints by plaintiff, including increasing breathlessness and palpitations.  Dr. Katz found that transtelephonic cardiac monitoring by Holter monitor demonstrated recurrence of plaintiff's arrhythmias.  Based on the evidence of current arrhythmia, Dr. Katz increased her daily medical regimen. Tr. at 439; 445.

The record indicates that plaintiff received emergency room treatment on February 12, 1997, where an EKG was taken and medication given, including IV therapy. Tr. at 415.  By letter dated June 11, 1997, Dr. Katz set forth a diagnosis of sustained AV nodal reentry tachycardia and atrial tachycardia, and wrote that plaintiff "recently has had an increase in her symptoms accompanied by an increasing breathlessness and decreased exercise tolerance."  At that time,

plaintiff's episodes of palpitations were being evaluated via telephonic cardiac monitoring, which Dr. Katz maintained was absolutely necessary to document the arrhythmias that plaintiff was experiencing.  Tr. at 133.  Dr. Katz prescribed the monitoring from June 1996 through June 1997. Tr. at 132.  The record indicates that the monitoring was continued under the direction of Dr. Stanley J. Schneller, M.D., at least through October 9, 1997.

Plaintiff underwent echocardiography on October 7, 1998. Tr. at 396.  On October 12, 1998, plaintiff underwent cardiac catheterization at Columbia-Presbyterian Medical Center, in New York, N.Y. to evaluate her multivalvular heart disease. Tr. at 453; 270.  It was determined that plaintiff had sustained AV nodal reentry tachycardia.  A successful ablation of AV nodal entry was indicated. Tr. at 452.  Medical records for 1999, if any, are missing from the record, and on January 20, 2000, plaintiff was in a motor vehicle accident.  The ALJ found that plaintiff was disabled from that point forward. Tr. at 25.

## II.   DISCUSSION

### A.   Standard of review

This court does not review a final decision of the Commissioner <u>de novo</u>, but instead "must determine whether the correct legal standards were applied and whether substantial evidence supports the decision."  <u>Butts v. Barnhart</u>, 388 F.3d

377, 384 (2d Cir. 2004) (internal citations omitted).  <u>See also</u> <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004);  <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Halloran</u>, 362 F.3d at 31 (<u>quoting</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)).  "An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision."  <u>Gravel v. Barnhart</u>, 360 F.Supp.2d 442, 444-45 (N.D.N.Y. 2005) (<u>citing</u> <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984)).   When reviewing a determination by the Commissioner, a district court, in its discretion, "shall have the power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  "The Act must be liberally applied, for it is a remedial statute intended to include [,] not exclude."  <u>Cruz v. Sullivan</u>, 912 F.2d 8, 11 (2d Cir. 1990).

**B.    Disability Defined**

An individual is considered disabled for purposes of his or her eligibility for Social Security Disability if he or she is unable to

> engage in any substantial gainful activity by reason of
> any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

The Commissioner may deem an individual applicant for Social Security

Disability to be disabled

> only if his physical or mental impairment or impairments
> are of such severity that he is not only unable to do his
> previous work but cannot, considering his age,
> education, and work experience, engage in any other
> kind of substantial gainful work which exists in the
> national economy, regardless of whether such work
> exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he
> would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

Social Security Administration regulations set forth a five-step sequential

evaluation process, by which the Commissioner is to determine whether an

applicant for Social Security Disability is disabled pursuant to the aforementioned

statutory definition.  See 20 C.F.R. § 404.1520.  The Second Circuit Court of

Appeals summarizes this process as follows:

> The first step of this process requires the Secretary to
> determine whether the claimant is presently employed. If
> the claimant is not employed, the Secretary then

13

determines whether the claimant has a "severe impairment" that limits [his] capacity to work. If the claimant has such an impairment, the Secretary next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the Secretary will find the claimant disabled. However, if the claimant does not have a listed impairment, the Secretary must determine, under the fourth step, whether the claimant possesses the residual functional capacity[4] to perform [his] past relevant work. Finally, if the claimant is unable to perform [his] past relevant work, the Secretary determines whether the claimant is capable of performing any other work. If the claimant satisfies [his] burden of proving the requirements in the first four steps, the burden then shifts to the Secretary to prove in the fifth step that the claimant is capable of working.

Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)).

The fifth step "requires the [ALJ] to consider the so-called vocational factors (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy." Quezada v. Barnhart, 2007 WL 1723615 (S.D.N.Y. 2007) (internal quotations omitted).

_____

    4    Residual functional capacity ("RFC") refers to what a claimant can still do in a work setting despite any physical and/or mental limitations caused by his or her impairments and any related symptoms, such as pain.  An ALJ must assess the patient's RFC based on all the relevant evidence in the case record. See 20 C.F.R. § 404.1545 (a)(1).

As a threshold issue, the court emphasizes that 42 U.S.C. § 423(d)(1)(A) specifically states that a person is deemed disabled if he or she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  Substantial work activity is defined as "work activity that involves doing significant physical or mental activities.  Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  Gainful work activity is defined as "work activity that you do for pay or profit.  Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(a-b) (West 2009).

### C.    Analysis

Plaintiff argues two issues before the court.  First, plaintiff argues that the Appeals Council erred in refusing to remand this case even though the ALJ failed to clarify the plaintiff's condition prior to her date last insured by obtaining information from her treating physicians at that time.  Second, plaintiff argues that the Appeals Council refused to remand this case even though plaintiff's counsel submitted new evidence showing that the plaintiff had mitral commissurotomy

15

surgery on April 12, 1988, prior to her date last insured of December 31, 1988.

Doc. No. 8, pp. 3-4. The court considers each argument below.

      1.    ALJ's Failure to Clarify Plaintiff's Condition

     Plaintiff argues that the ALJ failed to clarify her condition prior to her date

last insured by obtaining information from her treating physicians at that time.

Defendant counters that plaintiff had the burden of furnishing evidence

establishing the severity of her impairments, and that the record contained

sufficient medical evidence for the period on or before December 31, 1988 to

indicate that plaintiff did not have a severe impairment. Doc. No. 13, p. 12.  The

court disagrees with the defendant.  Upon reviewing the record as a whole, as it is

tasked to do, the court finds that the ALJ disregarded substantial evidence that

might have resulted in a finding that the plaintiff was disabled prior to December

31, 1988.  For example, in his short recitation of the evidence, the ALJ misstates

dates and procedures, indicating to the court that he failed to perform an in-depth

evaluation of the medical history. For example, the ALJ states that

"[c]omissurotomy (sic) was performed in 1987 and 1988," which is contrary to the

record, which indicates that one open heart surgery was performed on April 12,

1988.  Further on in the decision, the ALJ states that "the record shows that she

had surgery in 1988 to excise tissue from the mitral valve ...." Tr. at 21.  This of

16

course, refers to the commissurotomy performed on April 12, 1988.  Still later in

his decision, the ALJ states that "[i]n 1988 she had surgery wherein they took her

heart out and manually opened her valves.  Her heart beat was up to 170 beats per

minute." Tr. at 23.  Again, the ALJ refers to the surgery performed by Dr. Cooley

at the Texas Heart Institute.  Finally, despite evidence to the contrary, which the

court gleaned from the same record that was before the ALJ, the ALJ stated that

"[i]n 1996, she underwent ablation of the AV mote (sic) to correct the arrhythmias.

Once again, she required no further treatment until February 2000." Tr. at 21.  The

record contains substantial evidence that plaintiff sought medical help for her

heart disease continuously during the period of time the ALJ refers to, including

prescribed 24 hour a day heart monitoring for well over a year.

The court notes that much of the ALJ's  recitation of plaintiff's medical

history was essentially taken verbatim from an initial office visit summary written

by Harry C. Odabashion, Jr., M.D. ("Dr. Odabashion") on August 12, 2003,

including the errors contained within that summary.  The ALJ haphazardly

supplemented Dr. Odabashion's summary from the record, resulting in a less than

complete or accurate depiction of plaintiff's cardiac history.

The court finds the ALJ's evaluation of the plaintiff's medical records

careless at best, with a written summary that is piecemeal, consisting of

17

observations taken from secondary sources, when the original sources were available to him.  The ALJ summarized almost fifty years of the plaintiff's struggle with heart disease and chronic palpitations and arrhythmias in one paragraph before determining that plaintiff was not disabled pursuant to the Act. However, the ALJ did consider plaintiff's heart disease in finding her disabled subsequent to an automobile accident in January of 2000, stating that "[b]eginning January 1, 2000, the claimant retains the residual functional capacity to perform no work that exists in significant numbers in the national economy secondary to her fatigue," fatigue being a complaint resulting from plaintiff's heart issues. Tr. at 22. The ALJ also considered the evaluation of cardiologist Dr. Katz in finding that plaintiff is "no longer able to tolerate stress," and cardiologist Dr. Odabashian's evaluation that plaintiff is "limited to standing and/or walking for less than two hours in an eight hour workday with normal breaks."

The ALJ also states that "[a]lthough the Administrative Law Judge finds that the claimant's testimony is generally credible, he does not find that the testimony establishes limitations that would interfere with her ability to perform basic work functions prior to her date last insured for Disability Insurance Benefits." Tr. at 23.  The ALJ states that "a review of the claimant's work history shows that the clamant worked only sporadically prior to the alleged disability

onset date, which raises a question as to whether the claimant's continuing

unemployment is actually due to medical impairments." Tr. at 23.  The ALJ failed

to take into consideration plaintiff's marriage and move to another country, or

ample evidence throughout the record of her continuing heart disease.  The ALJ

goes on to state that "[f]urthermore, the claimant did not previously apply for

disability benefits which one would assume that if her cardiac condition was of the

severity as suggested she would have sought disability benefits earlier." Tr. at 23.

Again, the ALJ failed to take into consideration plaintiff's life circumstances and

changes thereto, in particular, plaintiff's divorce on May 1, 2000, after the motor

vehicle accident and prior to the date she filed for DIB (Tr. at 97; 80).   Plaintiff

testified that her husband "made a very considerable living," so employment  was

"not an issue" for her. Tr. at 42.  The court also discerns from the record that

plaintiff's husband previously paid her medical bills (see, e.g., Tr. at 415).

Plaintiff testified that subsequent to the divorce she had been paid maintenance,

but at the time of the hearing, that income had "been cut." Tr. at 42.  Plaintiff's

divorce consequently impacted her financial situation, eventually leading to a

bankruptcy filing in 2001.  An insurance settlement in September of 2002, payable

to plaintiff subsequent to the motor vehicle accident, was distributed by the

bankruptcy trustee to plaintiff's creditors. Tr. at 87; 25-26.  Consequently, after

19

reviewing the record, the court questions the ALJ's credibility assessment based on plaintiff's sporadic work history.  The court finds that the ALJ's decision is not supported by substantial evidence in the record, and will remand for further consideration consistent with this opinion.

            2.       Submission of New Evidence

        Subsequent to the ALJ's partially favorable opinion (denying DIB but allowing SSI benefits), plaintiff's counsel obtained the 1988 records of Dr. Cooley of the Texas Heart Institute, providing them to the Appeals Council on March 14, 2005.  Plaintiff  now argues that the Appeals Council should have remanded based on this new evidence.

        Section 404.967 of the Act states in pertinent part that "[i]f you or any other party is dissatisfied with the hearing decision or with the dismissal of a hearing request, you may request that the Appeals Council review that action...."  Section 404.970(b) states that "[i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.  The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.  It will then review the case if it finds

that the administrative law judge's action, findings, or conclusion is contrary to the

weight of the evidence currently of record." 20 C.F.R. §§ 404.967 and 404.970

(West 2009).

As a threshold matter, the court finds that the new and material evidence

relates to the period on or before the date of the administrative law judge hearing

decision, therefore it is relevant to the case at bar and should have been considered

by the Appeals Council.  Defendant asserts that new evidence from plaintiff's

surgeon further supports the ALJ's finding that plaintiff's heart condition was not

severe on or before December 31, 1988, because Dr. Cooley reported that the

surgery was very satisfactory.  Defendant stated that Dr. Cooley "did not believe

that plaintiff required any further surgery, and he recommended that her condition

be managed medically."  The court finds that the defendant misstates the evidence

in Dr. Cooley's medical report.  After a thorough evaluation of the extensive

record, the court discerns from the record that plaintiff developed mitral stenosis

from her childhood bouts with rheumatic fever, and the commissurotomy was

performed to correct the mitral stenosis.  Plaintiff's arrhythmia (also known as

dysrhythmia) commenced after her episode of subacute bacterial endocarditis at

age nineteen (Tr. at 490), continued throughout the years, and was ongoing at the

time of the ALJ's hearing. As stated supra, Dr. Cooley opined that plaintiff did not

21

have a surgically correctable type dysrhythmia, and that plaintiff should be managed medically.  In other words, while Dr. Cooley stated that "a very satisfactory mitral commissurotomy was performed," he also stated that her dysrhythmia was not surgically correctable.  The court notes that plaintiff suffered from two distinct medical issues, and accordingly, the evidence does not substantiate defendant's assertion that plaintiff's heart condition was not severe.

The court finds that the Appeals Council should have remanded plaintiff's case back to the ALJ based on the information before it, including the records of Dr. Cooley submitted by plaintiff's counsel, for the ALJ to review and clarify plaintiff's heart condition on or before December 31, 1988.

## III.   CONCLUSION

For the reasons set forth in the body of this decision, the Commissioner's decision denying plaintiff's disability benefits is hereby REVERSED and REMANDED for further consideration consistent with this opinion.  The Commissioner's motion for judgment on the pleadings is DENIED.

SO ORDERED.

November 20, 2009.

_____
Neal P. McCurn
Senior  U.S. District Judge

22